# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LEAH KNEPPAR, on behalf of herself
and all others similarly situated,

        Plaintiffs,

   v.

THE ELEVANCE HEALTH
COMPANIES, INC. f/k/a THE
ANTHEM COMPANIES, INC.,

        Defendant.

Case Action No.  8:23-cv-00863-TDC

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR COURT-AUTHORIZED NOTICE UNDER THE FLSA**

## <u>TABLE OF CONTENTS</u>

**Page**

BACKGROUND ..................................................................................................... 4

ARGUMENT ......................................................................................................... 7

I.    This Court Should Not Use Conditional Certification to Rubberstamp Notice to
       Non-Parties to this Case. ............................................................................... 8

       A.     The FLSA Permits and Urges Assessing the Viability of Collective
              Proceedings Without Resorting to Conditional Certification. .............. 8

              1.     The FLSA ............................................................................... 8

              2.     Notice is discretionary and a conditional certification process isn't
                     required. ............................................................................... 9

       B.     Conditional Certification's Shortfalls Overwhelm its Usefulness in This
              Case. ..................................................................................... 10

       C.     A Fairer, More Efficient, and Statutorily Permitted Inquiry Exists. ..................... 12

II.   Kneppar Fails to Prove That She and Opt-In Plaintiffs Are Similarly Situated
       Even Under the Two-Step Approach. ............................................................ 16

III.  Kneppar's Proposed Notice and Process for Distribution Should Be Rejected. .............. 22

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abe v. Vir. Dept. of Environmental Quality*,
  No. 3:20-cv-270, 2021 WL 1845324 (E.D. Va. Apr. 6, 2021) .................................................8

*Amhaz v. Booking.com (USA), Inc.*,
  No. 17 Civ. 2120 (GBD)(HBP), 2018 WL 279468 ................................................................19

*Bancroft v. 217 Bourbon, LLC*,
  2022 WL 124025 (E.D. La. Jan. 13, 2022) ............................................................................13

*Bigger v. Facebook, Inc.*,
  947 F.3d 1043 (7th Cir. 2020) ...............................................................................................10

*Boykin v. Anadarko Petroleum Corp.*,
  2018 WL 1406878 (D. Colo. Mar. 21, 2018) .........................................................................23

*Broome v. CRST Malone, Inc.*,
  2022 WL 205675 (N.D. Ala. Jan. 21, 2022).....................................................................13, 15

*Brown v. Rapid Response Delivery, Inc.*,
  No. RDB-16-1203, 2017 WL 55858 (D. Md. Jan. 4, 2017) .............................................16, 17

*Butler v. DirectSAT USA, LLC*,
  876 F. Supp. 2d 560 (D. Md. 2012) .......................................................................................16

*Calderon v. GEICO Gen. Ins. Co.*,
  809 F.3d 111 (4th Cir. 2015) .................................................................................................14

*Campbell v. City of Los Angeles*,
  903 F.3d 1090 (9th Cir. 2018) ...............................................................................................11

*Charbonneau v. Mortg. Lenders of Am.*,
  2018 WL 6423584 (D. Kan. 2018) .........................................................................................23

*Cirillo v. Citrix Systems, Inc.*,
  No. 5:21-cv-0088, 2022 WL 841327 (E.D.N.C. Mar. 21, 2022).....................................15, 16

*Cohen v. Gerson Lehrman Grp., Inc.*,
  686 F. Supp. 2d 317 (S.D.N.Y. 2010)....................................................................................14

*D'Anna v. M/A-COM, Inc.*,
  903 F. Supp. 889 (D. Md. 1995) ..............................................................................................9

*Degidio v. Crazy Horse Saloon & Rest. Inc.*,
    880 F.3d 135 (4th Cir. 2018) ...............................................10

*Hilley v. Tacala, LLC*,
    No. 2:12-cv-2691-SLB, 2014 WL 1246364 (N.D. Ala. Mar. 24, 2014) ................................23

*Hipp v. Liberty Nat'l Life Ins. Co.*,
    252 F.3d 1208 (11th Cir. 2001) ...............................................9

*Hoffmann-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989)..........................................9, 10, 15, 17

*Isett v. Aetna Life Ins. Co.*,
    947 F.3d 122 (2d Cir. 2020)..............................................15

*Jenkins v. TJX Companies Inc.*,
    853 F. Supp. 2d 317 (E.D.N.Y. 2012) ...................................19

*Long v. CPI Sec. Sys., Inc.*,
    292 F.RD. 296, 305 (W.D.N.C. 2013) ....................................15

*Mathews v. USA Today Sports Media Group, LLC*,
    No. 1:22-cv-1407, 2023 WL 3676795 (E.D. Va. Apr. 14, 2023) ...........................10

*Mathews v. USA Today Sports Media Group, LLC*,
    No. 1:22-cv-1407 (E.D. Va. Apr. 14, 2023) .........................11, 12, 13, 15

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010).................................................9

*Myles v. Prosperity Mortg. Co.*,
    No. Civ. CCB-11-234, 2012 WL 1963390 (D. Md. May 31, 2012)................................16, 17

*Purdham v. Fairfax Cnty. Pub. Sch.*,
    629 F. Supp. 2d 544 (E.D. Va. 2009) ....................................17

*Quinteros v. Sparkle Cleaning, Inc.*
    532 F. Supp. 2d 762 (D. Md. 2008) .....................................16

*Rosinbaum v. Flowers Foods, Inc.*,
    238 F. Supp. 3d 738 (E.D.N.C. 2017)......................................8

*Scott v. Chipotle Mexican Grill, Inc.*,
    954 F.3d 502 (2d Cir. 2020)..............................................8, 11

*Smith v. Preferred Family Healthcare, Inc.*,
    No. 1:17-cv-00082 (E.D. Ark. Jan. 5, 2018)..............................19

*Stacy v. Jennmar Corp. of Virginia, Inc.*,
   No. 1:21-cv-00015, 2021 WL 4787278 (W.D. Vir. Oct. 14, 2021) .......................................23

*Swales v. KLLM Transp. Servs.*,
   LLC, 985 F.3d 430 (5th Cir. 2021) ................................................................ *passim*

*Syrja v. Westat, Inc.*,
   756 F. Supp. 2d 682, 686 (D. Md. 2010 (denying conditional certification)) ..................16, 17

*Tyler v. Taco Bell Corp.*,
   2016 WL 2344229 (W.D. Tenn. 2016) ................................................................19

*Williams v. Charlotte-Mecklenburg Hospital Authority*,
   No. 3:20-cv-00242, 2022 WL 1019241 (W.D.N.C. Apr. 5, 2022) ...................................22, 23

## Statutes

29 U.S.C. § 216(b) ................................................................ *passim*

Fair Labor Standards Act ................................................................ *passim*

## Other Authorities

29 C.F.R. § 541.2 ................................................................14

Rule 23 ................................................................7

Plaintiff Leah Kneppar asks this Court to certify a Fair Labor Standards Act (the "FLSA" or the "Act") collective with virtually no evidence beyond her self-serving, unsubstantiated declaration that the proposed collective is "similarly situated."

What Kneppar's scant showing reveals, if anything, is that she accounts for only a sliver of the collective she asks this Court to certify. The collective would include nurses who worked at Elevance offices[1] or from their own homes; but Kneppar worked only from her own house. (Doc. 1, at ¶ 22; Bartlett Decl., Exh. A (Kneppar Dep, at 74:9-13)). The collective would include nurses who worked across at least four different job titles; but Kneppar worked in only one (Nurse Medical Management II). (Bartlett Decl., Exh. A (Kneppar Dep., at 50:19-22)). The collective would include nurses who did reviews for health care services under Maryland insurance products; but Kneppar never did reviews on Maryland products or knows anything about those reviews. (Bartlett Decl., Exh. A (Kneppar Dep., at 73:5-19, 366:19-21)). The collective could include nurses who worked on Medicare, Medicaid, federal employee, and commercial insurance products (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶7)); but Kneppar primarily worked on Medicare Advantage, and only inpatient reviews. (Bartlett Decl., Exh. A (Kneppar Dep. at 67:20-69:22)). She did not identify any products from the federal employee or commercial insurance divisions that she worked on while at Elevance. (*Id.*). The collective would include nurses who utilized clinical guidelines that Kneppar did not use, and vice versa, which is critical given that clinical guidelines are the chief culprit behind Kneppar's claims that she and all other registered nurses in her proposed collective were misclassified despite their licensure and handsome salaries.

---

[1] The Anthem Companies, Inc. recently rebranded as The Elevance Health Companies, Inc. Anthem, Inc. likewise rebranded as Elevance, Inc. For ease of reference, this brief refers to the former Anthem entities under their new name, Elevance.

(Doc. 1, at ¶¶ 31, Doc. 31-1, at 7-9, 13-15).[2] Nobody has joined Kneppar in this case since it was filed six months ago, including the one nurse with whom Kneppar discussed the litigation, (Bartlett Decl., Exh. A (Kneppar Dep. at 48:14-50:16)),[3] nor any individuals who have visited Kneppar's counsel's website concerning this case (https://www.nka.com/cases/a-f/elevance-health-md/ (last visited Sept. 28, 2023), which includes a link to join the lawsuit.

Kneppar attempts to remedy her myopic perspective by relying on testimony of others who similarly lack knowledge about nurses who worked in Maryland. She cites the testimony of her own manager, but that individual testified that Kneppar was her only direct report in Maryland. (Bartlett Decl., Exh. B (Morgan Dep., at 6:15-19)). She cites the testimony of a Medical Director, but he testified that he was only familiar with Medicare programs, which Elevance does not offer in Maryland. (Bartlett Decl., Exh. C (Suarez Dep. at 16:3-12)). Kneppar relies on testimony from Gina Russell-Reynolds, who oversees a program for which Kneppar never conducted reviews. *Compare* Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 2) (indicating that Russell-Reynolds has worked on Maryland and D.C. health plans) *with* Bartlett Decl., Exh. A (Kneppar Dep., at 72:20-73:15, 322:3-5) (indicating that Kneppar worked primary on Connecticut health care plans and never Maryland or D.C. products).

Despite her lack of evidence, her myopic experience, the absence of demonstrated interest in the case, and the early stage of this case—no written discovery has been exchanged (Doc. 31-1 at 6)—Kneppar asks this Court to "conditionally certify" all current and former Elevance employees who worked in Maryland as salaried-exempt utilization review nurses, regardless of

---

[2] All cites to pages numbers of previously filed ECF documents refer to the page number imprinted by CM/ECF, not as paginated in footers on the document.

[3] Notably, that nurse has not opted to join in this lawsuit, as Kneppar is the only individual who has filed a consent form.

what plans they worked on, what guidelines they used, or how their program operated. She wants, in other words, to have this Court approve notice to individuals based on superficial allegations alone, then have the parties conduct full-blown discovery on the claims of all the nurses who join the case, and only then decide whether that group actually satisfies the FLSA's requirement in 29 U.S.C. § 216(b) that individuals be "similarly situated" in order to litigate their claims together.

As federal courts, both district level and appellate, are increasingly recognizing, the conditional certification rubric that Kneppar invokes appears *nowhere* in the FLSA's text, has *never* been blessed by the Supreme Court, and activates all the dangers of group litigation with little benefit. Indeed, it inverts the proper course of affairs by allowing notice to issue and cases to proceed *en masse* without first determining whether the proposed plaintiffs are "similarly situated." The Fifth Circuit Court of Appeals' more commonsense, horse-before-cart approach is particularly warranted here, where Kneppar seeks to blast notice to a group of nurses without any relevant evidence, nor any showing of interest from putative plaintiffs. This Court and the parties before it lose *nothing* by taking discovery on the "similar situated" inquiry of 29 U.S.C. § 216(b) before blasting an invitation to join the lawsuit to nurses who Kneppar knows and offers little about and who currently have nothing to do with this case. As is, Kneppar's request to send that invitation rests almost entirely on her pleadings and her own declaration, which offers no insight into the experiences of any other putative collective action member, except that the one nurse she spoke with about the lawsuit has not shown any interest in joining.

Because differences between Kneppar and other utilization management nurses abound, and also because Kneppar has failed to present any real evidence of any sort that she is similarly situated to any other utilization review nurse working in Maryland, even a preliminary, or

3

"conditional," certification of Kneppar's proposed collective makes little sense. This Court should reject Kneppar's invitation and deny her request for conditional certification of a collective.

## BACKGROUND

### *The Elevance Health Companies*

Defendant The Elevance Health Companies, Inc. ("Elevance"), is an Indiana company that provides back-end, administrative support to Elevance subsidiaries in, for example, HR, tax, finance, payroll, and legal services. (Doc. 15, at ¶¶ 18-19).

Elevance Health Inc., also based in Indiana, is one of the largest health benefits companies in the country. Through its affiliated plans, Elevance Health, Inc. delivers a number of health benefit solutions through a portfolio of plans and services, along with a range of specialty products like life and disability insurance benefits, dental, vision, and behavioral health benefit services, and long-term care insurance and flex spending accounts. (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 4)).

Elevance Health, Inc.'s 171 subsidiaries, including 60 regulated insurance companies, employ thousands of individuals in a variety of jobs to provide that broad suite of products and services. (*Id.*) The insurance subsidiaries enjoy operational independence, including, for example, in structuring their medical necessity review processes, and deciding what tools and systems to use. (*Id.*, at ¶¶ 5-9).

### *The Proposed Collective Spans Four Job Titles Across Various Teams and Divisions*

Without identifying what type of reviews they perform or what health plans they serve, Kneppar seeks to conditionally certify a collective of salaried, exempt-classified nurses working in Maryland in one of at least four, undefined roles—"utilization review nurses, medical management nurses, utilization management nurses, utilization managers, or in similar positions." (Doc. 31-1, at 5). Kneppar admitted that she was part of a job class at Elevance called Nurse

Medical Management, or "NMMs." (Doc. 1, at ¶ 22). As discussed below, the NMM job family in fact encompasses four distinct job titles—of which Kneppar worked in only one.

Although she cites other cases involving Elevance in which conditional certification was granted to support this motion (Doc. 31-1, at 5, n.3), none of those courts certified a class as broad as the one she seeks to certify here, as each case only involves evaluation of the NMM roles, and none of those decisions were based on so thin an evidentiary record as Kneppar presents here.

### <u>*The Nurse Medical Management Positions*</u>

Of the positions Kneppar seeks to include in a collective, only the NMM job titles are salaried, exempt classified nurse positions that perform utilization management reviews. (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 18)). That job family comprises four distinct job titles: NMM I, NMM II, NMM Senior, and NMM Lead. (*Id.*, at ¶ 17).

Kneppar worked in just one of the NMM job titles: NMM II. (Bartlett Decl., Exh. A (Kneppar Dep., at 50:19-22); Doc. 31-3, at ¶ 2). She testified that everyone else on her team were NMMs but does not specify which NMM title any of them worked in. (Bartlett Decl., Exh. A (Kneppar Dep., at 51:6-8) and thus her declaration (the only declaration from a member of the proposed collective) and deposition testimony captures, at most, only one of the job titles embraced by the proposed collective. Kneppar offers zero evidence on the NMM I, NMM Senior, or NMM Lead roles.

In contrast, Elevance presents evidence that significant differences exist among these distinct job titles. The actual duties of NMMs vary in ways that the NMM job titles alone do not capture. Differences include, for example: (i) the reviews they conduct and criteria they evaluate; (ii) the nature and extent of their interactions with providers and members; (iii) their level of supervision; (iv) the training they receive; and (v) the training they provide. (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 19)).

Kneppar states that her primary duty was "reviewing medical authorization requests submitted by healthcare providers against pre-determined guidelines and criteria for insurance coverage and payment purposes." (Doc. 31-3, at ¶ 6). That grossly oversimplifies the NMM II role.

Some nurses evaluate inpatient procedure requests—requests for services that require the member to remain in the hospital overnight—while others review outpatient requests, acute procedures, continued stays, or only post-acute requests. (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶¶ 20-26)). Acute reviews are "one and done," in contrast to continued stay reviews that follow members throughout their time in the hospital. (*Id.*, at ¶ 27). Post-acute reviews bear little resemblance to either, instead focusing on successful discharge to the next level of care. (*Id.* at ¶ 28).

Utilization review nurses also work in different divisions of Elevance on different health insurance products reviewing different types of benefits. Some nurses work in Elevance's commercial division, others in the government division. (*Id.*, at ¶¶ 6-7). Some review inpatient procedures, others outpatient. (*Id.*, at ¶¶ 21-22).

With different NMM teams come different clinical guidelines, which is critical given that guidelines are at the heart of Kneppar's claim that her nursing skill and judgment were substituted out in favor of guidelines that somehow made critical decisions for her. Under Kneppar's theory, what the guidelines say matters. But the guidelines aren't the same. For example, preservice outpatient teams use Wellpoint Clinical Utilization Management guidelines, while inpatient acute teams use Milliman Care Guidelines, and Maryland inpatient subacute teams use a third set of guidelines, InterQual. (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 22)). Other forms of

inter-team differentiation occurs, too. Inpatient requests, for example, have to be evaluated within 72 hours, while preservice reviews can take up to 14 calendar days. (*Id.*, at ¶ 25).

Even within a particular team, there are differences. Within the preservice team, reviews are distributed by category. Categories include durable medical equipment, home health, physical therapy, outpatient surgery, and occupational therapy. (*Id.*, at ¶ 26).

Seniority in the NMM job family spawns still other differences. Nurses in NMM Senior and Lead roles often train and educate NMM Is and IIs. (*Id.*, at ¶ 29). And NMM Leads spend substantially less time than other NMMs conducting utilization reviews,  instead spending their time serving as assistant managers, using their nursing judgment and discretion, as well as their experience, to conduct audits and reviews of cases assigned to other NMMs, assess NMM nurse production, and provide performance feedback to other NMMs. (*Id.*, at ¶ 29).

Kneppar ignores these and all other distinctions, despite the fact—or perhaps due to the fact—that they so clearly shape the day-to-day experiences of the nurses she purports to include in this lawsuit and are directly relevant to the exemption analysis at the heart of her claims. Particularly given the extremely thin "support" for conditional certification that Kneppar offers, this Court should exercise its discretion to manage the notice process and decline Kneppar's invitation to "conditionally" certify a collective.

## ARGUMENT

The FLSA's text contains no "conditional certification" procedure akin to Rule 23 for class actions, yet Kneppar insists that this Court must use that test as part of its discretionary decision of whether or not to issue notice. As a threshold matter, Kneppar is incorrect that the two part conditional certification process is required. More significantly, even if this Court were to apply the two step approach, it should still deny Kneppar's motion because she has not presented, and,

based upon her deposition testimony cannot proffer, evidence that the broad collective that she seeks to conditionally certify is "similarly situated" even under the lowest of standards.

I.   **This Court Should Not Use Conditional Certification to Rubberstamp Notice to Non-Parties to this Case.**

Kneppar asserts that a two-step conditional certification process, initiated by a lenient first step, is mandatory and justified when assessing the viability of an FLSA collective action. But the Act's text, Supreme Court precedent, and other circuits' jurisprudence all confirm it's neither required nor wise in all cases. Conditional certification's inherent flaws reinforce that conclusion. There's a more sensible approach in cases like this one, and nothing prevents the Court from taking it.

A.   **The FLSA Permits and Urges Assessing the Viability of Collective Proceedings Without Resorting to Conditional Certification.**

Understanding why conditional certification is neither required nor a good idea in this requires a full picture of the legal foundations of FLSA collective actions. And that starts with the statute's text.

1.   *The FLSA*

The FLSA permits employees suing their employers for unpaid overtime compensation to proceed "for and in behalf of . . . themselves and other employees" only if they are "***similarly situated***." 29 U.S.C. § 216(b) (emphasis added). That's all the statute says about collective proceedings. It does not define the phrase "similarly situated." *See Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 515 (2d Cir. 2020). And "[t]he Fourth Circuit has not announced a test to determine whether employees are similarly situated under the FLSA." *Rosinbaum v. Flowers Foods, Inc.*, 238 F. Supp. 3d 738, 743 (E.D.N.C. 2017); *see also Abe v. Vir. Dept. of Environmental Quality*, No. 3:20-cv-270, 2021 WL 1845324, at *2 (E.D. Va. Apr. 6, 2021) (stating that "the

FLSA does not define 'similarly situated' and the Fourth Circuit has not set out a standard for this term in the context of a FLSA collective action.").

The statute also doesn't say anything about certification of a collective, much less conditional certification—neither word shows up in the statute. Employees may proceed "for and in behalf" of others if they are similarly situated. *Id.* And if they aren't similarly situated, they may not. The similarly situated inquiry, then, is the alpha and omega of collective proceedings under the FLSA. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001); *Swales v. KLLM Transp. Servs.*, LLC, 985 F.3d 430, 440 (5th Cir. 2021).

To protect against excessive litigation by disinterested parties, the FLSA also requires employees to consent in writing to join collective actions. 29 U.S.C. § 216(b); *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989). That "opt-in" requirement means employees need "accurate and timely notice" of a collective action to participate and benefit. 493 U.S. at 170.

### 2. *Notice is discretionary and a conditional certification process isn't required.*

Courts have discretion to manage the notice process. *Id.* at 169-70; *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (noting that "[a]lthough they are not required to do so by FLSA, district courts 'have discretion, in appropriate cases, to implement § 216(b) by facilitating notice to potential plaintiffs . . . .'") (quoting *Hoffmann-La Roche*, 493 U.S. at 169). Indeed, the FLSA's "affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties." *Hoffmann-La Roche*, 493 U.S. at 170. But not at the expense of "statutory commands" like the similarly situated requirement itself. *Id.* "The plaintiff has the burden of demonstrating that notice is 'appropriate.'" *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995).

Judicial involvement in the notice process facilitates both enforcement of the FLSA and "efficiency in the resolution of disputes." *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1049 (7th Cir. 2020). It also protects against plaintiffs using the collective action mechanism as settlement leverage, "no matter the action's merits." *Id.* (noting that "expanding . . . litigation with additional plaintiffs increases pressure to settle").

Courts, however, must take care to avoid exercising their discretion over notice in ways that create "the appearance of judicial endorsement of the merits of the action." *Hoffmann-La Roche*, 493 U.S. at 174. "Given the real risk of abuse of the collective-action device, a court's intervention in the notice process cannot devolve into the solicitation of claims." *Swales*, 985 F.3d at 436 (quotes omitted). The risk of abuse lies not just with "the appearance of court-endorsed solicitation of claims," but also the "exert[ion of] formidable settlement pressure." *Id.* at 435-36.

The Supreme Court has never dictated *how* courts should supervise the notice process. Similarly, the Fourth Circuit not adopted a particular process for evaluating whether and when notice should be issued, much less required the two step conditional certification approach Kneppar invokes. *See Mathews v. USA Today Sports Media Group, LLC*, No. 1:22-cv-1407, 2023 WL 3676795, at *3 (E.D. Va. Apr. 14, 2023). "Rather, the Fourth Circuit merely has noted only that district courts have discretion to supervise the notice-giving process." *Id.* (citing *Degidio v. Crazy Horse Saloon & Rest. Inc.*, 880 F.3d 135, 144 (4th Cir. 2018)).

### B.   Conditional Certification's Shortfalls Overwhelm its Usefulness in This Case.

Whatever usefulness the two-step process might possess in theory is overwhelmed by its practical shortcomings and risks. As *Swales* aptly noted, the conditional certification process "frustrates, rather than facilitates, the notice process" in two ways. *Swales*, 985 F.3d at 439.

First, "certification" or "conditional certification" has no consistent meaning. *Id.* at 440. The "ad hoc" standard applied varies from case to case, *see id.* at 436, offering "no clue as to what

kinds of 'similarity' matter under the FLSA. It is, in effect, a balancing test with no fulcrum." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1114 (9th Cir. 2018). The Second Circuit similarly has criticized the "ad hoc" approach to resolving the similarly situated question. *Scott*, 954 F.3d at 517 (citing *Campbell* with approval). Indeed, at least one district court within this Circuit has rejected the two step approach. *Mathews*, *supra*, at *3 (rejecting *Lusardi* and finding that the "correct approach" was defined by *Swales*).

Second, the two-step process "distracts from the FLSA's text." *Swales*, 985 F.3d at 440. As noted, § 216(b) says nothing about certification, conditional certification, decertification, or anything else involved in the two-step process. The FLSA simply says that if employees want to pursue their wage and hour claims "for and in behalf of" others, they must be "similarly situated." 29 U.S.C. § 216(b); s*ee Mathews, supra*, at *3 ("FLSA says nothing about 'conditional certification.' Rather, FLSA's text makes clear that district courts must ensure that notice goes out to those who are 'similarly situated' to the named plaintiffs."). It does not say that individuals may be invited to proceed collectively throughout costly, time-intensive discovery and that courts must delay deciding whether they are similarly situated until close to the end of the case. Yet that is the very outcome the two-step process creates. Put another way, that process subjugates the statutory fulcrum for aggregate FLSA proceedings to a judicially created process that unshackles the dangers of expansive litigation—drummed up costs, improper settlement leverage, and the appearance of judicial claims solicitation, to name a few. It allows cases to proceed as collectives without ever finding that the plaintiffs are similarly situated. *See Matthews*, at *3-*4.

Kneppar says otherwise and points to cases that describe conditional certification as a process by which courts consider whether employees "are similarly situated *enough*" (Doc. 31-1, at 10-11) (emphasis added). But Congress did not minimize or condition the "similarly situated"

inquiry in the plain language of the statute. And the Fourth Circuit has never squarely addressed the concerns outlined in *Swales*. The reality is that conditional certification does not meaningfully address the "similarly situated" requirement, but rather punts that exercise for later. If the first stage could truly and definitively resolve the issue, then courts would not have created the second step of the process *(i.e.,* courts would never decertify a conditionally certified collective). Step two does happen though, because step one, conditional certification, doesn't answer the similarly situated question on the front end. It, at best, *conditionally* answers the question, which is why some courts in this Circuit have found the conditional certification approach adopted in *Lusardi* to be "flawed." *Mathews*, *supra*, at *3.

Kneppar cites to a number of cases that have adopted the two step process, (Doc. 31-1, at 10-13) but few, if any, of those courts actually found textual authority in the FLSA for doing so. As *Swales* aptly noted:

> Two-stage certification of § 216(b) collective actions may be common practice. But practice is not necessarily precedent. And nothing in the FLSA, nor in Supreme Court precedent interpreting it, requires or recommends (or even authorizes) any "certification" process. The law instead says that the district court's job is ensuring that notice goes out to those who are "similarly situated," in a way that scrupulously avoids endorsing the merits of the case.

985 F.3d at 440.

In essence, the two-step process results in courts endorsing notice, and forces defendants to litigate FLSA cases as collective actions, prior to satisfaction of the FLSA's similarly situated requirement. This Court should avoid that path, particularly since a better option exists.

### C.    A Fairer, More Efficient, and Statutorily Permitted Inquiry Exists.

Instead of invoking the a-textual conditional certification rubric that Kneppar suggests, this Court can, and should, exercise its recognized discretion to oversee notice in a process that adheres to § 216(b)'s text either by denying certification outright or by ordering discovery on whether

members of the collective are actually similarly situated with respect to the facts and the law. Again, the paramount concern in deciding to authorize notice must be whether the proposed collective members are "similarly situated." *See* 29 U.S.C. § 216(b). Courts must make that decision prior to authorizing the issuance of notice to non-party individuals inviting them to join a lawsuit. *See id.*; *Swales*, 985 F.3d at 440; *Mathews, supra*, at *3-*4.

Deciding whether a group of individuals is similarly situated requires facts that are almost never available at the outset of a misclassification case. To bridge that gap, courts should "identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of employees is similarly situated." *Broome v. CRST Malone, Inc.*, 2022 WL 205675, at *4 (N.D. Ala. Jan. 21, 2022) (quoting *Swales*, 985 F.3d at 441). They should then "authorize preliminary discovery accordingly." *Id.*

In *Broome*, where truck drivers claimed misclassification as independent contractors, that meant the court allowed two months for limited written discovery (25 written requests) and depositions (one for each party) aimed at illuminating aspects of the economic reality test. 2022 WL 205675, at *4; *see also Swales*, 985 F.3d at 442. "[I]n cases where the plaintiffs have demonstrably different work experiences," by contrast, "district court[s] will necessarily need more discovery to determine whether notice is going out to those similarly situated." *Bancroft v. 217 Bourbon, LLC*, 2022 WL 124025, at *4 (E.D. La. Jan. 13, 2022) (quotes omitted).

Unsurprisingly, as demonstrated in *Broome*, the type of FLSA case that presents courts with the most challenging "similarly situated" issues are misclassification cases, such as this one. These cases stand in contrast to FLSA cases involving an employer's policy that facially violates the FLSA, such as a categorical refusal to pay any overtime to any employee. Whether independent contractor misclassification, which involves the economic reality test, or exemption

13

misclassification cases, which involve a primary duties analysis and the application of multiple factors, courts have noted that such cases involve a "thicket of competing factual assertions." *Cohen v. Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 330 (S.D.N.Y. 2010) (declining to wade into that thicket on grounds that "to hold to the contrary would preclude [conditional] certification of a collective action in any FLSA case where the defendant was asserting an administrative exemption defense."). In fact, although Kneppar seeks to define a collective based largely on job titles—because she provides no evidence of similar primary duties across a collective of Maryland based employees—the DOL regulations themselves state that "[a] job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2; *see also Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 128-29 & n. 15 (4th Cir. 2015) (citing same and stating that even though insurance claims adjusters "generally meet the duties requirements for the administrative exemption" even for this class of employees "the question of whether they satisfy the directly related elements is determined on a case-by-case basis and depends on their specific duties.").

The fact that a similarly situated finding may involve complicated factual issues does not relieve a litigant of its textual obligation under § 216(b) to prove that collective members are "similarly situated." Although courts have created a process that kicks the can on this issue by permitting notice and then, later, decertifying a conditionally certified collective, this shortcut unavoidably places a judicial thumb on the scales by allowing the size of a case—and with it, the expenditure of time, the cost of discovery, and the degree of settlement pressure—to explode prematurely in a case based on sparse allegations and miniscule evidence.

14

As Kneppar acknowledges, only "minimal discovery" has taken place in this case. (Doc. 31-1, at 5). As explained below in Section II, *infra*, the little "evidence" Kneppar has submitted is insufficient to meet her low burden even under the two step process. But this Court need not reach that issue if it follows *Swales*, *Broome*, and *Mathews* and permits discovery on the primary duties of purported collective members, a material fact central to both the similarly situated inquiry and the merits of Kneppar's misclassification theory and Elevance's exemption defenses thereto. Doing so is most consistent with the text of the FLSA and the Supreme Court's directive that courts not issue notice at the expense of "statutory commands" like the similarly situated requirement. *Hoffmann-La-Roche*, 493 U.S. at 170.

This caution is particularly warranted where, as here, a named plaintiff offers virtually no evidence that the members of her proposed collective are "similarly situated" to her, and significant authority governs liability issues. *See Isett v. Aetna Life Ins. Co.*, 947 F.3d 122 (2d Cir. 2020) (finding that utilization review nurses who are RNs are properly classified as exempt). Although Kneppar may complain that this gets at the merits of this case, something she believes should be ignored until step two of a two-step process found nowhere in the FLSA, courts note that the inquiry at conditional certification includes a burden on the party seeking notice to demonstrate that "the members of the proposed collective are similarly situated 'with respect to their allegations that the law has been violated.'" *Cirillo v. Citrix Systems, Inc.*, No. 5:21-cv-0088, 2022 WL 841327, at *3 (E.D.N.C. Mar. 21, 2022) (quoting *Long v. CPI Sec. Sys., Inc.*, 292 F.RD. 296, 305 (W.D.N.C. 2013).

It may be, as Elevance contends, that after discovery, notice should not issue at all in this case because individual variation in claims and defenses preclude a finding of substantial similarity. Without more evidence, however, this Court cannot answer the question. And given the

FLSA's clear mandate that only those who are similarly situated may proceed collectively, the question should be answered before notice issues.

## II.     Kneppar Fails to Prove That She and Opt-In Plaintiffs Are Similarly Situated Even Under the Two-Step Approach.

Even if this Court chooses to use the two-step process, which, again, the Fourth Circuit has not adopted, it should still deny Kneppar's motion because she fails to demonstrate that members of her proposed collective are "similarity situated enough" for notice to issue.

Under the first step, district courts apply a lenient standard—a sort of "similarly situated"-lite analysis—to decide whether the plaintiff and potential opt-in plaintiffs are "sufficiently 'similarly situated' to warrant notice being given to allow potential plaintiffs to opt-in and to proceed as a collective action through discovery… . . ." *Cirillo, supra,* at *3. At this stage, a plaintiff must make a "preliminary factual showing that a similarly situated group of potential plaintiffs exists." *Myles v. Prosperity Mortg. Co.*, No. Civ. CCB-11-234, 2012 WL 1963390, at *5 (D. Md. May 31, 2012); *Quinteros v. Sparkle Cleaning, Inc.* 532 F. Supp. 2d 762, 771 (D. Md. 2008) (same). At a minimum, a plaintiff must demonstrate that she and the potential opt in plaintiffs "together were victims of a common policy or plan that violated the law." *Myles, at *5.* "[A] court may determine that conditional certification is inappropriate where multiple claims cannot be adjudicated efficiently because they could require 'substantial individualized determinations for each class member.'" *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010 (denying conditional certification)).

A plaintiff's burden at this stage may be low, but a plaintiff "must set forth more than 'vague allegations' with 'meager factual support….'" *Butler v. DirectSAT USA, LLC,* 876 F. Supp. 2d 560, 567 (D. Md. 2012); *Brown v. Rapid Response Delivery, Inc.*, No. RDB-16-1203, 2017 WL 55858, at *2 (D. Md. Jan. 4, 2017). If the court "conditionally certifies" a collective, notice issues.

*Syrja*, *supra*, at 686. Even then though, courts "must be scrupulous to respect judicial neutrality" when "exercising the discretionary authority to oversee the notice-giving process." *Hoffman-La Roche*, 493 U.S. at 174. Where, however, the evidence cannot establish that members of the proposed collective are similarly situated, and notice is not appropriate, "a court can deny certification outright." *Myles v. Prosperity Mortg. Co.*, at *5 (quoting *Purdham v. Fairfax Cnty. Pub. Sch.*, 629 F. Supp. 2d 544, 547 (E.D. Va. 2009).

After a notice period and after discovery, a decertification motion tees up step two—a full-bore similarly situated inquiry, in which courts, finally, "determine whether the plaintiff class is 'similarly situated' in accordance with the requirements of § 216." *Brown, supra*, at *2. However, this Court need never address either the question of which standard to apply or step two of the conditional certification process because, even if the Court applies the two step approach, Kneppar has utterly failed to present sufficient evidence to support notice to any Maryland collective under the conditional certification standard.

Kneppar relies heavily on her own declaration to satisfy her burden, but it offers zero evidence of similarity with to any other member of the proposed collective. First, Kneppar admitted she worked remotely from her home "throughout [her] employment." (Doc. 31-3, at ¶3). Kneppar only went to an Elevance office twice: on her first day with Elevance, and a second time to "swap out" her computer. (Bartlett Decl., Exh. A (Kneppar Dep. at 74:9-13)). Kneppar has only spoken with one other nurse about this lawsuit. (*Id.*, at 48:14-50:16). Despite that conversation, as well as the advertisement of this lawsuit and a form to join it on Kneppar's counsel's website (*see* https://www.nka.com/cases/a-f/elevance-health-md/ (last visited Sept. 28, 2023)), no one has chosen to join the case.

Kneppar's deposition testimony confirms, furthermore, that she lacks personal knowledge about nurses who conduct reviews relating to Maryland insurance products. Specifically, Kneppar testified that she did not work on a Maryland insurance product, so she did not know how Maryland review teams were structured, if Maryland had a behavioral health team, "if they used medical policy or not," or if the Maryland inpatient review team conducts level of care reviews or not. (Bartlett Decl., Exh. A (Kneppar Dep., at 318:1-319:14)). Nor does she know what Maryland Medicaid policies say about the hierarchy of various guidelines used in a review, or whether Maryland Medicaid reviewers use the same templates that she did for her Connecticut Medicare reviews. (*Id.* at 319:15-320:14).

Kneppar's blind spots don't end there. With respect to Elevance commercial policies in Maryland, she testified that she did not know what guidelines reviewers used for requests related to those commercial products, that she never worked on Maryland commercial products at Elevance, and that any information that she had would have come not from her work at Elevance, but rather from her prior experience at hospitals, and she admitted that "things could have been updated and changed since then, so I don't—you know, I can't, like, speak to it a hundred percent in any capacity." (*Id.*, at 320:15-322:5).

In addition to her lack of experience with utilization reviews on Maryland products, Kneppar also has conceded that she only held the NMM II job title during her employment at Elevance. (*Id.*, at 50:19-22). Her declaration thus presents evidence only about that single job title, despite the fact that Kneppar seeks to include various other positions in her proposed collective. There is no evidence supporting her motion with respect to those other job titles, and the inclusion of Kneppar's job description (Doc. 31-6) doesn't help, as it also only encompasses the NMM II position.

Finally, with respect to the insufficiency of Kneppar's declaration, the only individuals who were NMMs about whom she claims to have "personal knowledge" of their job duties are Yanessa Jeannot, Hope Gonzalez, Elizabeth Bramman, Shemia Lasane, and Rexie Lawrence. However, *none* of these individuals are members of her proposed collective, as *none* of these women worked in Maryland or even conducted reviews for Maryland insurance products. ((Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 15; (Bartlett Decl., Exh. A (Kneppar Dep. at 315:7-317:14)). To the extent Kneppar relies upon her "belief" with respect to any other nurses based upon training, shared training does not create statutorily required similarity and "belief" is not personal knowledge. *See Tyler v. Taco Bell Corp.*, 2016 WL 2344229, at *4 (W.D. Tenn. 2016) (finding that "training materials" did not support conditional certification, nor did testimony that putative plaintiffs "completed the same training").

Courts regularly deny certification of large collectives that include individuals who the plaintiff could not have personally witnessed or observed, even if they all held the same title and the company used centralized job descriptions. *See, e.g., Jenkins v. TJX Companies Inc.*, 853 F. Supp. 2d 317, 321 (E.D.N.Y. 2012) (denying conditional certification of nationwide class based upon deposition testimony of plaintiff); *Amhaz v. Booking.com (USA), Inc.*, No. 17 Civ. 2120 (GBD)(HBP), 2018 WL 279468, at *8 (report and recommendation conditionally certifying collective only of 3 offices where plaintiff worked and denying conditional certification of employees in any other office because plaintiff failed to show that account managers in other offices "were similarly situated with respect to the claim that they were required to perform non-managerial job duties in contravention of the formal job description"); *Smith v. Preferred Family Healthcare, Inc.*, No. 1:17-cv-00082, at *2-*3 (E.D. Ark. Jan. 5, 2018) (denying conditional certification of mental health professionals working in a multi-state region and finding that

standard forms, training, and speaking with other professions was "not enough to make even a modest factual showing that [plaintiff] is similarly situated").

Other than her declaration and job description, Kneppar relies only on testimony from her manager, Halcyone Morgan, Dr. Suarez, and Gina Russell-Reynolds. As a threshold matter, neither Ms. Morgan nor Dr. Suarez provided *any* testimony that utilization review nurses in Maryland were in any way similarly situated. In fact, Ms. Morgan testified that, besides Kneppar, she had *no other direct reports* who worked in Maryland. (Bartlett Decl., Exh. B (Morgan Dep., at 6:15-19)). Ms. Morgan thus has not, and cannot, provide evidence that members of the proposed collective had the same primary duties or were subject to the same management pay decisions. Similarly, Dr. Suarez testified that he was only familiar with Medicare programs (Bartlett Decl., Exh. C (Suarez Dep. at 16:3-12)), but Elevance was not involved in any Medicare program in Maryland. (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 14)).

Kneppar also attempts to rely on testimony from Gina Russell-Reynolds, who oversees a program for which Kneppar never conducted reviews. *Compare* Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶ 2) (indicating that Russell-Reynolds has worked on Maryland and D.C. health plans) *with* (Bartlett Decl., Exh. A (Kneppar Dep., at 72:20-73:15) (indicating that Kneppar worked primary on Connecticut health care plans and did not list Maryland or D.C. as an area for which she did reviews). In her attached declaration, however, Ms. Russell-Reynolds provides testimony about why significant differences exist between NMMs at Elevance. For example, Ms. Russell-Reynolds points out that Elevance has a number of different divisions, each of which offers different products and are further divided by geography, and Elevance leaves the various subsidiaries to make independent decisions about operations, including how to structure medical necessity reviews. (Bartlett Decl., Exh. D (Russell-Reynolds Decl., at ¶¶ 5-9)). Ms. Russell-

Reynolds declared that the work experiences among even just the NMM job titles vary depending on a myriad of factors, including differences in (i) the reviews they conduct and criteria they evaluate; (ii) the nature and extent of their interactions with providers and members; (iii) their level of supervision; (iv) the training they receive; and (v) the training they provide. (Russell-Reynolds Decl., at ¶ 19). She indicated that seniority within the NMM job category leads to other differences, with an NMM Lead spending substantially less time than other NMMs conducting utilization reviews and instead doing management tasks such as audits, providing feedback, and assisting other NMMs. (*Id.,* at ¶ 29).

Ms. Russell-Reynolds further testified that NMMs work on different teams, with some teams working only on preservice or outpatient requests, other teams working on inpatient acute, a still different team of nurses works on inpatient subacute services, and another handles high tech radiology outpatient services. (*Id.*, at ¶¶ 20-24). Russell-Reynolds noted that each team utilizes different types of guidelines and has other operational differences, such as expected turnaround windows. (*Id.*., at ¶¶ 22-25). She testified that there are differences even within teams. Within the preservice team, for example, requests for services are distributed for review by a variety of categories.  (*Id.*, at ¶ 26).[4]

Kneppar thus has failed to demonstrate a common policy or practice that could drive the determination of this case on a class-wide basis across three divisions, numerous teams, and four

---

[4] The Russell-Reynolds Declaration does not contradict any of her deposition testimony attached to Kneppar's Motion. (Doc. 31-6). Much of that deposition testimony is irrelevant to the motion, as it concerns Elevance's corporate structure, quality control processes, and the software or general policies governing the Maryland Medicaid plan, which, again, Kneppar never worked on. Tellingly, Kneppar steered away from dissecting the primary duties of utilization review nurses on the Maryland Medicaid program, which would only serve to undermine her collective, yet Russell-Reynolds still testified about such differences in her deposition. (*See, e.g.*, Doc. 31-6, at 52:22-53:6). She simply provides more explanation and detail about those differences in her declaration. (Bartlett Decl., Exh. D).

21

job titles that she attempts to shoehorn into this action. The best she could hope to achieve is establishing that the work *she* did from her home for Elevance on insurance products related to other states wasn't sufficiently advanced to justify exemption from the FLSA's minimum wage and overtime requirements. That, however, says nothing about the exempt status of other employees who worked in Maryland on Maryland products, under different managers, in different locations. At bottom, whether or not this Court exercises its discretion to dispense with the atextual two-step process, Kneppar fails to meet her burden of showing the positions she places at issue are similarly situated.

### III.   Kneppar's Proposed Notice and Process for Distribution Should Be Rejected.

Kneppar includes with her motion a draft notice and proposed plan for sending it to members of the putative collective. She asks this Court to exercise its discretion in overseeing notice through a process that peppers potential members of the collective with notice. She wants to mail it. (Doc. 31-1 at 19). She wants to email it. (*Id.*) She wants to text it, which requires the disclosure of private information (mobile phone numbers) that could result in cellular data charges to members of the collective. (*Id.*) And then she wants to do it all over again with an undefined "reminder" notice 21 days before the deadline to opt-in. (*Id.*, at 20).

Ultimately, Kneppar would inundate putative collective members with as many as *six* communications about their opportunity to join the lawsuit, as if acting on the notice by opting in was as obvious as the choice to resolve a past due invoice that's sent to a debtor multiple times. She also demands the disclosure of cellular phone numbers, which multiple district courts in the Fourth Circuit have held may only be required if the "plaintiffs show a special need for telephone numbers" so that courts can "protect the privacy of potential plaintiffs." *Williams v. Charlotte-Mecklenburg Hospital Authority,* No. 3:20-cv-00242, 2022 WL 1019241, at *3 (W.D.N.C. Apr. 5, 2022) (denying request for telephone numbers and text notice except for "those potential plaintiffs

whose initial notice by mail and email are returned as undeliverable") (cited cases omitted). Kneppar does not identify any "special need" for cell numbers, and she offers no reason why standard mailing and emailing of notice once would in any way be insufficient.

Kneppar's proposed approach is invasive and harassing, and it risks the appearance of judicial endorsement of Kneppar's claims. The purpose of notice is to notify putative class members of a lawsuit and their right to join it, not to harangue or even encourage them to join. *See Charbonneau v. Mortg. Lenders of Am.*, 2018 WL 6423584, at *4 (D. Kan. 2018); *see also Williams v. Charlotte-Mecklenburg Hospital Authority,* No. 3:20-cv-00242-RJC-DSC, 2022 WL 1019241, at *2-*3 (W.D.N.C. Apr. 5, 2022) (citing *Charbonneau* with approval in rejecting text and workplace posting forms of notice); *Hilley v. Tacala, LLC*, No. 2:12-cv-2691-SLB, 2014 WL 1246364 , at *2 (N.D. Ala. Mar. 24, 2014) ("This court takes seriously its 'responsibility to avoid the stirring up of litigation through unwarranted solicitation.'"). Kneppar fails to substantiate why a single notice sent once using methods that do not impinge upon privacy interests isn't enough to do what notice exists to do, *i.e.,* notify recipients of this lawsuit and their opportunity to join. There's no need to send the same notice three ways upfront, nor is there any need to pre-authorize "reminder" notices without proof that initial notice was ineffective. *See Stacy v. Jennmar Corp. of Virginia, Inc.*, No. 1:21-cv-00015*,* 2021 WL 4787278, at * 5 (W.D. Vir. Oct. 14, 2021) (citing *Charbonneau*, limiting forms of initial notice, and finding that "a reminder notice is unnecessary, at least until the plaintiffs show that the original notice was ineffective."); *Boykin v. Anadarko Petroleum Corp.*, 2018 WL 1406878, at *4 (D. Colo. Mar. 21, 2018); *Williams*, at *2-*3 (rejecting text notice unless and until notices by mail and email were returned as undeliverable).

In addition to taking serious issue with Kneppar's proposal to shower putative collective members with notices about this lawsuit and their opportunity to join it, Elevance objects to the

substance of the notice. As drafted, the notice is vague, stilted in Kneppar's favor in numerous respects, and not sufficiently detailed to notify putative collective members about the full slate of consequences of joining a lawsuit as well as their opportunity to abstain by doing nothing. To resolve these objections, Elevance requests that, in the event this Court conditionally certifies an FLSA collective of any scope, the parties be given 21 days to confer about and present, if possible, a jointly proposed notice and notice distribution plan,[5] after which appropriately limited contact information for the class that this Court defines would be due for exchange within 30 days.

## CONCLUSION

This Court should deny Kneppar's motion for court-authorized notice under the FLSA (Doc. 31). If the Court does so because it agrees that the text of the FLSA requires a definitive finding that the proposed collective is "similarly situated," the Court may order discovery concerning whether the proposed collective members are in fact similarly situated. If, on the other hand, the Court applies the two-step test and agrees Kneppar has not met even this lower standard, it should deny the motion and order the case to proceed with respect to Kneppar's claims only.

---

[5] As Plaintiff utterly fails to specify the form(s) of her proposed "reminder" notice(s), the Court should, at a minimum, order the parties to meet and confer about that.

DATED:  September 29, 2023                    Respectfully submitted,

By:  */s/ Christine M. Costantino*
　　　Christine M. Costantino
　　　Va. Bar No. 86986
　　　SEYFARTH SHAW LLP
　　　975 F. Street, NW
　　　Washington, DC  20004
　　　Telephone: (202) 463-2400
　　　Facsimile: (202) 828-5393
　　　ccostantino@seyfarth.com

　　　Kevin M. Young (admitted *pro hac vice*)
　　　kyoung@seyfarth.com
　　　Brett C. Bartlett (admitted *pro hac vice*)
　　　bbartlett@seyfarth.com
　　　Lennon B. Haas (admitted *pro hac vice*)
　　　lhaas@seyfarth.com
　　　SEYFARTH SHAW LLP
　　　1075 Peachtree Street, N.E.
　　　Suite 2500
　　　Atlanta, GA  30309
　　　Telephone: (404) 885-1500
　　　Facsimile:  (404) 856-7092

　　　*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2023, Elevance's Response in Opposition to Plaintiff's Motion for Court-Authorized Notice Under the FLSA <u>FLSA</u> was filed with the Clerk of Court for the United States District Court for the District of Maryland using the CM/ECF system.

*/s/ Christine M. Costantino*
Christine M. Costantino

97986733v.2