UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| LEAH KNEPPAR, on behalf of herself and all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>THE ELEVANCE HEALTH COMPANIES, INC. f/k/a THE ANTHEM COMPANIES, INC.,<br><br>        Defendant. | Case No. 8:23-cv-00863-MJM |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DECERTIFY<br>THE CONDITIONALLY-CERTIFIED COLLECTIVE**

**TABLE OF CONTENTS**

**Page**

I. CONSIDERABLE FLEXIBILITY AND OPERATIONAL INDEPENDENCE EXISTS ACROSS ELEVANCE, ITS SUBSIDIARIES, AND THE STRUCTURE OF MEDICAL NECESSITY REVIEWS .................................................... 2

II. CONDITIONAL CERTIFICATION OF THE COLLECTIVE CAME WITHOUT THE BENEFIT OF THE INFORMATION THE PARTIES HAVE NOW. ....................... 3

III. PLAINTIFFS MUST NOW SATISFY A HEIGHTENED BURDEN TO PROCEED AS A COLLECTIVE. ............................................................................... 4

    A. Plaintiffs Cannot Satisfy Their Heightened Burden. ............................................. 5

        1. Plaintiffs Held Different Job Duties. ........................................................... 5

        2. Plaintiffs Interpreted and Conducted Different Types of Medical Necessity Reviews. ..................................................................................... 7

        3. Plaintiffs' Alleged Hours Worked As Well As Schedules Varied and Certain Plaintiffs Are Distinguishable Since They Fall Under the Highly Compensated Exemption. ........................................................... 9

    B. Individualized Defenses to Plaintiffs' Claims Prevent a Collective Trial. ........... 13

    C. Fairness and Procedural Considerations Require Decertification. ....................... 16

CONCLUSION ............................................................................................................................. 17

This Court conditionally certified an FLSA collective action in March of 2024 under a fairly lenient pre-discovery standard. Now, with the benefit of a full discovery record, the Court must undertake a stringent, heightened, and fact-specific inquiry to determine whether the record shows that the disparate collective of nurses which remain in this case are, in fact, "similarly situated." As a result, Plaintiff Leah Kneppar ("Plaintiff" or "Kneppar") must show that nurses who worked on different teams, conducting different types of reviews, performing different duties, under different guidelines, pertaining to vastly divergent medical decision, allege they worked significantly different hours, and received different salaries, should proceed to trial on a collective basis.

At the pre-discovery stage, Kneppar oversimplified evidence to the point that it appeared that a skyscraper and a grain of a salt cast the same shadow by arguing that a medical necessity review is a medical necessity review without any distinction. To state the obvious, a precertification, inpatient review, conducted for a hospital admission, *is not* an outpatient, post-acute review involving a patient's medical records after a patient is discharged from the hospital. Those medical necessity reviews took place in disparate factual and employment settings, as did Plaintiffs' claims. In fact, the only thing those medical necessity reviews seem to have in common is that the vast majority were conducted by a Registered Nurse ("RN") and required discretion and advanced medical knowledge.

As a result, to the extent Kneppar's or any of the Opt-In Plaintiffs' claims survive summary judgment despite the fact that FLSA exemption regulations provide that RNs are generally exempt, the remaining claims would require an individualized presentation of evidence that is not suitable for collective trial. This Court should thus decertify the conditionally certified collective and dismiss Plaintiffs' claims.

I.   **CONSIDERABLE FLEXIBILITY AND OPERATIONAL INDEPENDENCE EXISTS ACROSS ELEVANCE, ITS SUBSIDIARIES, AND THE STRUCTURE OF MEDICAL NECESSITY REVIEWS.**

Defendant The Elevance Health Companies, Inc., is an Indiana company with approximately 171 subsidiaries, 60 of which are regulated insurance companies. (Ex. 1, Declaration of Sherry Cole at ¶ 4, *Canaday v. The Anthem Companies, Inc.* Case No. 1:19-CV-01804 (W.D. Tenn. 2019), Doc. 53-2. Anthem employs thousands of individuals in a variety of jobs to provide a broad suite of products and services. *Id*. at ¶5. Elevance does not directly provide insurance benefits or services. *Id*. at ¶ 4.

According to the American Nurse Association ("ANA"), the premier organization representing the interests of our country's four million RNs, "[u]tilization management nurses are registered nurses (RNs) who work in various health care settings, such as hospitals, private practices, and insurance companies." American Nurses Enterprise, See What is a Utilization Management Nurse?, ANA Nursing Resources Hub, http://www.nursingworld.org/content-hub/resources/nursing-resources/utilization-management-nurse/ (last visited April 17, 2025). The goal of a utilization management nurse "is to ensure patients receive the care they need while managing costs and making the best use of available resources—without unnecessary or duplicate services."

Utilization review nurses' main duties include examining medical procedures and other services "to avoid payment denial and optimizing reimbursements by assessing the treatment's appropriateness, effectiveness, timing, and setting" and they must "examine treatment plans with a critical eye" to "ensure the patient receives the best care while determining what level of treatment is necessary." See American Nurse Enterprise, *supra*.

While each of the Plaintiffs engaged in utilization review at some point during their employment, their similarities end roughly there. Plaintiffs generally were employed in jobs that

2

were part of the Nurse Medical Management ("NMM") job family which includes two different titles: NMM I and NMM II. Apart from their licenses and titles, Plaintiffs worked on different teams, performing different duties and processes, under different care guidelines and medical necessity criteria, to conduct very different types of medical necessity reviews. *See infra* Section III (A). Together, this disjointed group of NMMs are plagued by individualized issues that are not suited for a collective trial.

## II. CONDITIONAL CERTIFICATION OF THE COLLECTIVE CAME WITHOUT THE BENEFIT OF THE INFORMATION THE PARTIES HAVE NOW.

Elevance employed Kneppar as an NMM II nurse from February 25, 2019 to March 24, 2023. (Ex. 2, Kneppar Resume and Profile). A week after ending her employment with Elevance, on March 29, 2023, Kneppar filed this lawsuit, claiming Elevance violated the Fair Labor Standards Act ("FLSA") and Maryland Wage Payment and Collection Law ("MWPCL") by classifying her as exempt and not paying her overtime wages. (Doc. 1).

Shortly after this lawsuit began, Kneppar filed a motion to conditionally certify a collective and notice under the FLSA. (Doc. 31). The Court subsequently granted that motion under a more lenient standard. (Doc. 44). The conditionally certified collective included "[a]ll persons who worked as Medical Management Nurses, Utilization Management Nurses, Utilization Managers, Utilization Review Nurses, or in similar job titles who were paid a salary and treated as exempt from overtime laws and were primarily responsible for performing medical necessity reviews for Defendant in Maryland at any time three years prior to the filing of the Complaint through judgment." (*Id.*) The proposed collective class members involve two other distinct job titles in addition to Kneppar's: NMM I and NMM Senior. Ten individuals (Gabriella Carroll, Barbara Currie, Merina Daniel, Tiffany France, Margart Powell, Sammy Ruto, Ellen Segal, Lilian Slater, and Christal White), including Kneppar, joined and remain in this case.

3

**III.     PLAINTIFFS MUST NOW SATISFY A HEIGHTENED BURDEN TO PROCEED AS A COLLECTIVE.**

Section 16(b) of the FLSA permits plaintiffs alleging FLSA violations to file claims on behalf of themselves and "other employees" but only where those other employees are "similarly situated." 29 U.S.C. § 216(b). To proceed on a collective basis, Plaintiffs must satisfy that burden. However, the FLSA does not define what "similarly situated means" and the Fourth Circuit has yet to set forth a standard for making this determination. *LaFleur v. Dollar Tree Stores, Inc*., 30 F. Supp. 3d 463, 467 (E.D. Va. 2014).

As a result, when evaluating whether employees are similarly situated and if they may proceed to trial on a collective basis, courts in this Circuit employ a two-step approach. *McLaurin v. Prestage Foods, Inc*., 271 F.R.D. 465, 469 (E.D.N.C. 2010) ("Certification of an FLSA collective action is typically a two-stage process."); *Staley v. UMAR Servs*., 630 F. Supp. 3d 707, 711 (M.D.N.C. 2022) (same).

At the first step only, plaintiffs are judged under a "fairly lenient standard." *Staley*, 630 F. Supp. 3d at 712. At the second step, however, the court, with a full discovery record, **undertakes a stringent, heightened fact-specific inquiry to determine whether the class is, in fact, similarly situated**. *LaFleur*, 30 F. Supp. 3d at 467; *Mode v. S-L Distrib. Co., LLC*, No. 18-cv-150, 2021 U.S. Dist. LEXIS 165511, *10 (W.D.N.C. Sep. 1, 2021) ("At this more advanced stage of the litigation, the Court … will apply a heightened fact-specific standard.") (emphasis added). When evaluating whether employees are similarly situated under this heightened standard, courts consider "(1) the disparate factual and employment settings of the individual plaintiffs; (2) defenses which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *LaFleur*, 30 F. Supp. 3d at 468; *Sellers v. Keller Unlimited LLC*, 386 F. Supp. 3d 631, 633 (D.S.C. 2019) (same).

4

### A.     Plaintiffs Cannot Satisfy Their Heightened Burden.

Plaintiffs must prove they are "similarly situated." *Sellers*, 386 F. Supp. 3d at 633 ("The plaintiff maintains the burden of proving that he or she is similarly situated to the opt-in plaintiffs."); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001) ("To maintain an opt-in class action under § 216(b), plaintiffs must demonstrate that they are 'similarly situated.'"). Yet, the record is replete with significant variations in job duties and work experiences that change from one nurse to the next and doom any such determination.

### 1.     Plaintiffs Held Different Job Duties.

Plaintiffs' testimony shows that the applicable duties, processes, and procedures changed from team to team, and in this case, from nurse to nurse. An employees' "status under the FLSA may vary, even if they have the same job title, if their job responsibilities and duties differ among each other." *In re Fam. Dollar FLSA Litig.*, No. 3:08MD1932-GCM, 2014 WL 1091356, at *2 (W.D.N.C. Mar. 18, 2014). Indeed, when handling FLSA exemption cases like here, courts advise a "careful factual analysis of the full range of the employee's job duties and responsibilities" should be done. *Id.* As Opt-In Plaintiff Gabriella Carroll acknowledges, comparing Plaintiffs' job duties is like comparing "apples to oranges." (Ex. 3 Deposition of Gabriella Carroll at 218:11-21).

Plaintiffs' different teams resulted in the processing of different claims and different approaches to conducting utilization reviews. Kneppar herself highlights the significant variance in job duties amongst the class based on the team they were assigned. Indeed, Kneppar is the ***only*** Plaintiff in this case to work on Medicare Advantage in a state outside of Maryland. (Ex. 4, Deposition of Leah Knepper at 67:20-68:18; 71:8-73:22).

Unlike other Plaintiffs, Kneppar worked on Medicare plans in Connecticut, Maine, New York, Virginia, New Jersey, and Rhode Island. (*Id.* at 73:5-16). Each of the states that Kneppar worked in "has their own process" for how different reviews should be handled. (*Id.* at 174:14-22,

5

241:9-18) (Acknowledging that although a general guideline can be for "Medicare Advantage, each state and entity, it seems, has their own process"). Her medical necessity review would depend on the state Medicare plan she was addressing. (*Id.* at 174:14-22, 241:19-243-11).

Similarly, Opt-In Plaintiff Merina Daniel was the only Plaintiff who worked on post-acute matters that other Plaintiffs "would not understand." (Ex. 5, Daniel Dep. at 43:24-25) ("Q. So you were the only post-acute -- A. I'm the main, yeah"); (*see also id*. at 65:2-67:2) (Q. But they couldn't do it all? A. No. That's why they constantly call me, like if they have any doubts. Q. And they call you because they would not understand to do what you do.)). Unlike all other Plaintiffs, Daniel's role involves an analysis of a patient's medical records after a patient is discharged from the hospital. (*Id*. at 79:8-80:22).

Opt-In Plaintiffs Carroll and Segal further highlight the difference in Plaintiffs' duties based on their job setting. Those two RNs worked only in Maryland on a unique Medicaid team for the University of Maryland requiring an understanding of different MCG guidelines and a single hospital system. (Ex. 3, Carroll Dep. at 162:18-164:5). Unlike other Plaintiffs, their role was particularly time sensitive in part because Maryland is a "fee-for-service" state, and the University of Maryland system required a determination on the date a determination was made. (*Id.* at 164:6-166:4). As mentioned by Opt-In Plaintiff Currie noting similar time constraints, the evaluation of a clinical file would require "[her] to ask questions differently depending on the hospital." (Ex. 6, Currie Dep. at 97:9-98:3). By comparison, other Plaintiffs did not have to review and submit clinical files on a daily basis. (Ex. 5, Daniel Dep. at 43:4-43:25, 44:1-44:22).

These divergent job duties and assigned teams create differences in Plaintiffs' exercise of independent and advanced clinical judgment—a key element of the administrative and professional exemptions. For example, Opt-In Plaintiff Daniel characterized herself as a "subject

6

matter expert" who had significant prior experience in particular health care specialties distinguishable from other Plaintiffs. (*Id.*) (referring to herself as an "SME" with experience working "mainly like in a post-acute setting and that was [her] passion")). This use of expertise, paired with her "get[ting] to know her patients and exhibit excellent bedside manners" would assist her in performing her duties. (*Id.* at 44:1-44:22). Other Plaintiffs also exercised independent and advanced clinical judgment but would do so without being bedside or relying on the same experience. (*See, e.g.,* Ex. 3, Carroll Dep. at 162:18-164:5)(noting that University of Maryland required an understanding of different guidelines and unique knowledge of the operations of a single hospital system).

These distinctions amongst Plaintiffs splinter any suggestion they are similarly situated. While it is true all Plaintiffs conducted utilization review, they all had distinguishable duties and responsibilities regarding the execution of their job duties.

### 2. Plaintiffs Interpreted and Conducted Different Types of Medical Necessity Reviews.

Plaintiffs' different teams and duties determined the guidelines and medical necessity criteria each relied upon. Some Plaintiffs' nurses worked in Medicaid plans addressing inpatient cases and focusing on patients admitted to the hospital. (*See e.g.,* Ex. 7, Powell Dep. at 169:1-169:18). Others, by contrast, worked on post-acute care, outpatient care, or behavioral health cases outside of the hospital setting, or on out-of-state inpatient reviews like Plaintiff. (Ex. 5, Daniel Dep. at 38:20-39:9; Ex. 5, Kneppar Dep., Vol. I. at 69:9-71:11). Each role required Plaintiffs to reference different sections or guidelines altogether.

These differences matter. Inpatient reviews involve analysis of a patient's medical records—in essence, a full assessment of a patient's conditions—to determine if admission to a hospital is advisable. (Ex. 6, Currie Dep. at 40:2-25; 45:1-47:1;119:10-120:5). Plaintiffs often

7

referenced relevant MCG guidelines in conducting their utilization review. Plaintiffs handling inpatient care reviews relying on MCG would sometimes review as many as 25 to 30 cases daily and determine whether initial or continued admission to the hospital was advisable. (Ex. 8, White Dep. at 148:4-149:22).

There is not a "one size fits all" approach to how guidelines would be used in evaluating clinical files, however. On some occasions, to properly assess medical necessity guidelines, Plaintiffs would have to ask several additional questions to "dig up the information" necessary depending on the clinical file, hospital, and pertinent guidelines. (Ex. 6, Currie Dep. at 97:9-98:3). On other occasions, where perhaps the clinical file, hospital, or guidelines are clearer, Plaintiffs could potentially complete their medical assessment quicker. (*Id.* at 98:10-99:14; see also Ex. 9, Segal Dep. at 189:19-190:10) ("Q. Every day's not the same, is it? A. No, every day's not the same. Q. And the case -- the case files you receive every day aren't the same, are they?"). Ultimately, the approach Plaintiffs would make regarding decisions—both small and large—involving medical criteria was based on varying levels of judgment particular to each and their respective clinical file. (Ex. 6, Currie Dep. at 89:23-90:2) ("A. Ms. Currie, given your relationship with Donna, do you think that in some instances you had to make decisions in isolation even though you wished that you had some support or somebody to talk to? A.  Oh, absolutely.  Yes.").

Plaintiffs' application and comprehension of medical guidelines also varied based on team and specialty. For Opt-In Plaintiff Daniel, assessing whether InterQual guidelines are satisfied are often "difficult to determine." (Ex. 5. at 79:8 -80:22). Daniel further notes that an assessment of the InterQual guidelines "goes hand and hand" with her own clinical judgment when making recommendations. (*Id.* at 114:22-115:15) ("A. No.  We can use the criteria. There is criteria in the -- for infection there, anti-infective. But what I needed, the duration and frequency is mainly for

8

me to determine the SNF level. That has nothing to do with the criteria. It goes hand in hand."). Other Opt-In Plaintiffs' understanding of the InterQual guidelines varied significantly as well; in fact, some did not understand the guidelines at all. (*Id.* at 80:7-24) (noting that the applicability of InterQual guidelines "depends on each nurse, what their understanding is, yes.").

By comparison, while Daniel understood the InterQual guidelines, she was entirely unfamiliar with the MCG guidelines other Plaintiffs utilized. (*Id* at 52:4-54:1)(stating she never used MCG during post-acute utilization review)). This divergence in understanding is representative of all Plaintiffs when compared. Even amongst two Plaintiffs utilizing the exact same guidelines, their prior experience and familiarity would influence their approach to conducting a utilization review. (*See e.g.,* Ex. 6, Currie Dep at 126:3-9,10-15)(noting that she did not receive training on how to review anything and she relied on her prior experience).

A closer eye to the evidence reveals that all ten Plaintiffs confronted and applied different guidelines on a day-to-day basis. Indeed, not all Plaintiffs even utilized the same generalized guidelines. The distinctions in the guidelines utilized by Plaintiffs further cuts against them being similarly situated.

    **3.**  **Plaintiffs' Alleged Hours Worked As Well As Schedules Varied and Certain Plaintiffs Are Distinguishable Since They Fall Under the Highly Compensated Exemption.**

Were the aforementioned differences not enough, Plaintiffs imprecise measurement of their work hours further undermines their alleged similar situation. Some Plaintiffs worked a little over 40 hours a week and never on weekends. (Ex. 8, White Dep. at 82:15-82:22). Others claimed they worked over 55 hours a week and almost every weekend. (Ex. 10, Slater Dep. at 114:1-12). Indeed, all Plaintiffs alleged they worked different hours and had different schedules.

9

| **Plaintiff** | **Hours Worked** |
|---|---|
| Leah Kneppar | **Hours**<br>From Feb. 25, 2019 through September 2019 she alleged she worked an average of **45** hours per week. (Kneppar Dep. at 61:20-62:12).<br>From January 2020 until her termination, she claims she alleged an average of **47.5** hours per week. (Ex. 12, Kneppar's Responses to Defendant's Interrogatory Requests at No. 11).<br>Plaintiff Kneppar alleged she did not take a 30-minute lunch. *Id.*<br>Plaintiff Kneppar alleged she occasionally worked on weekends. *Id.*<br><br>**Time Off**<br>Kneppar was on disability leave from Sept. 2019 through Jan. 2020 (Ex. 4, Kneppar Dep. at 61:20-66:3).<br>Kneppar took vacation time but did not take any sick days. (*Id.* at 66:8-20). |
| Christal White | **Hours**<br>White alleged that she worked an average of **61** hours a week for Elevance and sometimes more. (Ex 8, White Dep. at 107:2-16).<br>From March 2022 through April 2022, White alleged that she worked from 8:00 a.m. to 5:00 p.m. with a 30 minute lunch break three times per week. (*Id.* at 130:9-131:9).<br>White did not work for Elevance on the weekends. (White Dep. at 82:15-82:22).<br>White also worked another job while working for Elevance, in which she estimated that she worked 20 hours a week for. (*Id.*. at 83:2-11).<br><br>**Time Off**<br>White was on leave from early April 2022 through the end of her employment.(*Id.* at 128:3-16). |
| Gabriella Carroll | **Hours**<br>Carroll alleged that she worked **53.75** hours every week, sometimes more. (Ex. 3, Carroll Dep. at 67:14-68:5).<br>Carroll did not work any weekends for Elevance. (*Id.* at 69:19-70:3).<br>Carroll did not typically take any lunch breaks. (*Id.* at 78:1-3). |
| Ellen Segal | **Hours**<br>Segal alleged that she worked between **50 and 60** hours a week. (Ex. 9, Segal Dep. at 24:10-13).<br>Segal alleged that she worked on the weekends once a month. (*Id.* at 58:9 – 59:1).<br>Segal took an hour break to cool dinner each day and a 45 minute to an hour break four days per week to exercise. (Ex. 13, Segal's Responses to Defendant's Interrogatory Requests at No. 11). |

10

| Plaintiff | Hours Worked |
|---|---|
| Barbara Currie | **Hours**<br>Currie alleged that she worked on average **54.75** hours per week by starting at 8 a.m. and ending around 6 or 7 p.m. (Ex. 6, Currie Dep. at 49:15-25).<br>Currie alleged she did not take any lunch breaks. (Ex. 14, Currie's Responses to Defendant's Interrogatory Requests at No. 11).<br>Currie alleged that she worked approximately 10 times per year on the weekends for two to three hours at a time. *Id.* |
| Margaret Powell | **Hours**<br>Powell alleged she worked an average of **53.5** hours per week. (Ex. 7, Powell Dep. at 150:6–13).<br>Powell alleged that she did not take a 30-minute lunch break (Ex. 15, Powell's Responses to Defendant's Interrogatory Requests at No. 11)<br>Powell alleged that she worked most weekends to "finish up something." (Ex. 7, Powell Dep. at 154:8-11).<br><br>**Time Off**<br>Powell went on unpaid leave around 2021 or 2022. (*Id.* at 93:4-94:20).<br>Powell took vacation days while working for Elevance. (*Id.* at 92:14-19). |
| Lillian Slater | **Hours**<br>Slater alleged that she worked an average of **57.5** hours per week. (Ex. 10, Slater Dep. at 38:20- 40:23).<br>Slater alleged that she rarely took a lunch break. *Id.*<br>Slater alleged she worked most weekends. (*Id.* at 95:25-96:17). |
| Tiffany France | **Hours**<br>France alleged that she worked an average of **65** hours per week (Mon-Fri) starting at 9 a.m. and ending at midnight. (Ex. 16, France Dep. at 75:8-16).<br>France took a two hour break in the evenings every day. *Id.*<br>France alleged that she worked on weekends from 12 to 8 on Saturday and 12 to 11 on Sunday with various breaks although she does not know how often that happened. (*Id.* at 77:6-79:7). |
| Merina Daniel | **Hours**<br>Daniel alleged that she worked an average of 54.25 hours a week as she began at 8:30 a.m. and 8:00 a.m. two days of the week, working up to 7:30 or 8:00 p.m. (Ex. 5, Daniel Dep. at 22:23-23:8).<br>Daniel went to doctor appointments during personal lunch breaks. |

11

| Plaintiff | Hours Worked |
|---|---|
| | (*Id.*. at 31:2 – 12).<br>Daniel alleged that she worked some weekends, not all, for about 4 hours in the morning. (*Id.* at 23:23- 24:15).<br><br>**Time Off**<br>Daniel took PTO for her persona leave and FMLA for procedures. (*Id.* at 91:20-92:3). |

Plaintiffs fail to explain their disparate testimony. Instead, they offer guesstimates and vague memories unsupported by any other evidence. (*See e.g.,* Ex. 6, Currie Dep. at 71:2-71:8) ("Q:...Okay. And while you estimate that the hours you worked were 54.75 -- A. Yes. Q. -- are you certain that that was the amount of hours you worked every week? A. I can't be certain of anything at this point."). As an example, Opt-In Plaintiff White worked two jobs while at Elevance and could not recall which evenings she worked for Elevance until 10 pm versus a separate employer. (Ex. 8, White Dep. at 114:4-115:13) All she recalls is her frustration from working late. (*Id.* at 108:6-15;116:3-7).

Plaintiffs' lack of similarity pervades both liability and damages. To proceed with a collective, it must be established "from at least a manageably similar factual setting with respect to their job requirements and pay provisions." *Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 705 (E.D.N.C. 2011). No such similarity exists here.

In addition to Plaintiffs varied and impacted hours, the high salary of Plaintiffs further complicates class consideration since some are subject to the FLSA's highly compensated exemption ("HCE"). HCE requires an employee to perform an exempt duty while conducting non-manual work and earn more than $107,432 annually. *See* 29. C.F.R. § 541.601. Opt-In Plaintiff Segal, for instance, made $125,841.30 in 2021, $122,811.39 in 2022, and $111,807.16 in 2023.

12

(Ex. 11, Segal Paystubs).As a result, unlike some other Plaintiffs, she also qualified as exempt under the HCE.

## B. Individualized Defenses to Plaintiffs' Claims Prevent a Collective Trial.

Elevance's individualized exemption defenses to Plaintiffs' claims also make a collective trial improper. Elevance's motion for summary judgment shows that the undisputed facts warrant judgment in Elevance's favor under the FLSA's learned professional as well as the administrative exemption. Drawing on Plaintiffs' deposition testimony, tied together by their repeated (but contested) assurances that they are all similar to one another with respect to their duties, Elevance's motion presents a well-warranted and appropriate ending to this litigation.

If, however, the Court does not grant summary judgment, then a trial concerning Elevance's defenses to each Plaintiff's claims will require individualized testimony to the jury about what Plaintiffs' day-to-day duties and experiences looked like. *Oglesby v. Prof'l Transp. Inc.*, No. 19-cv-1573, 2020 U.S. Dist. LEXIS 188711, *15 (D.S.C. Oct. 13, 2020) ("In particular, because the claims in this case center on whether each plaintiff was properly classified as exempt and, if not, the amount of overtime hours they worked without compensation, the fact-finder will necessarily be required to conduct an individualized assessment of each plaintiff's claims."); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271–72 (M.D. Ala. 2004) (quoting *Morisky v. Public Service Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D. N.J. 2000) ("'[T]o determine which employees are entitled to overtime compensation under the [FLSA] depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria.'"). Because Plaintiffs' argument hinges on their testimony concerning their day-to-day duties, "the 'similarly situated' inquiry in this case must be analyzed in terms of the nature of the job duties

13

performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt." *Id.* at 1272.

For the learned professional exemption to apply, the employee must satisfy a "primary duty test" consisting of three factors: "(1) the work requires 'advanced knowledge,' (2) 'in a field of science or learning,' [that is] (3) 'customarily acquired by a prolonged course of specialized intellectual instruction.'" *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128 (2d Cir. 2020) (quoting 29 C.F.R. § 541.301(a)). As noted above, Plaintiffs performed their duties differently. "Defendants 'cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other.'" *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 378 (E.D. Mo. 2014) (*quoting Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008)).

It is of course true that, as a rule, RNs are exempt under the professional exemption, as it is presumed—under the FLSA's regulations—that the advanced education that they secure empowers them to exercise the nursing judgment that their medical care-impacting roles require of them. 29 C.F.R. § 541.301(e)(2) ("Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."). Should this Court conclude that Plaintiffs' claims create an exception to that rule (although the vast majority of Plaintiffs are RNs) or might create one to be considered by a fact-finding jury, then—not surprisingly—that exception-based argument would require an individualized assessment antithetical to collective action treatment.

Previous courts examining nurses in similar positions have found the "technical, medical nature of both the records and the guidelines involved," to be an influential factor. *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 40 (D.D.C. 2007). Defendants' professional exemption defense

14

will require examining the technical nature of the various guidelines used by the Plaintiffs, as well as the nature of the specializations Plaintiffs developed through their advanced knowledge and experience in specialized nursing fields. These inquiries are antithetical to the image of a collective action trial.

Elevance's FLSA administrative exemption defense is also too individualized for a collective trial. An employee qualifies for this exemption when her primary duty: (1) "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance." *Desmond v. PNGI Charles Town Gambling, L.L.C.*, 564 F.3d 688, 691 (4th Cir. 2009). The same factual dissimilarities that would make a collective action trial unwieldy as to the professional exemption plague the administrative exemption as well. *See Morisky*, 111 F. Supp. 2d at 499 (finding that the "extremely individual and fact-intensive" scrutiny for administrative-exemption analysis required "detailed analysis of the time spent performing administrative duties" and "a careful factual analysis of the full range of the employee's job duties and responsibilities") (internal citations omitted).

The so-called "combination exemption" may also apply to any Plaintiff who performed "a combination of exempt duties" under the professional or administrative exemptions. 29 C.F.R. § 541.708. This exemption "focuses solely on the employee's job duties. That is, it is the 'combination of exempt duties' that 'may qualify [an employee] for exemption.'" *Intracomm, Inc. v. BAE Systems, Info Tech, LLC*, 492 F.3d 285, 293 (4th Cir. 2007) (*citing* 29 C.F.R. § 541.708). It "provides a mechanism for cobbling together different duties for purposes of meeting the primary-duty test." *Id.* at 294. Like the other defenses, this one would require individualized testimony at

trial that runs counter to the purpose of the collective action mechanism, discussed more fully below.

### C. Fairness and Procedural Considerations Require Decertification.

Fairness and procedural concern further weigh against trying collectively the claims of any Plaintiffs who survive summary judgment. The issues Plaintiffs' respective claims would present for a collective action trial cannot be effectively managed in a manner consistent with the objectives of collective litigation.

A core objective of a collective action is to enhance judicial efficiency by resolving common issues of law and fact arising from the same alleged conduct. *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). This purpose is thwarted, however, when, as here, decertification-stage evidence shows dissimilarities among collective members that stand in the way of efficiently trying their claims. *Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1276 (N.D. Ala. 2012) (questioning using representative testimony where it will not "fairly encompass all the various job duties and processes" performed by the collective).

Simply stated, the need for mini-trials of the job duties of each Plaintiff outweighs the potential benefit of pooling resources. *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1063 (D. Minn. 2011) ("where Plaintiffs' duties and work performed vary significantly, the FLSA exemptions cannot be efficiently adjudicated en masse because the exemption analysis is fact-driven and Plaintiff-specific … The benefit of pooling Plaintiffs' resources is outweighed by the need for individual mini-trials in this case."). A collective action trial on Plaintiffs' claims cannot be fairly and effectively managed because the evidence demonstrates a variety of factors that would create the need for mini-trials. Perceived efficiency is not worth that risk.

Moreover, Plaintiffs have yet to propose a workable trial plan or model on which a jury could reliably determine liability or damages given the stark differences in their job duties and their varying hours.

## CONCLUSION

For the reasons stated herein, Elevance respectfully moves the Court to grant its Motion to Decertify the Collective Class and dismiss any remaining Plaintiffs.

DATED:  May 23, 2025                                      Respectfully submitted,

By: */s/ Christine M. Costantino*
Christine M. Costantino
Va. Bar No. 86986
SEYFARTH SHAW LLP
975 F. Street, NW
Washington, DC  20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5393
ccostantino@seyfarth.com

Kevin M. Young (admitted *pro hac vice)*
kyoung@seyfarth.com
Brett C. Bartlett (admitted *pro hac vice*)
bbartlett@seyfarth.com
Lennon B. Haas (admitted *pro hac vice)*
lhaas@seyfarth.com
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA  30309
Telephone: (404) 885-1500
Facsimile:  (404) 856-7092

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2025, *Defendants' Motion to Decertify the Conditionally-Certified Collective*, was filed with the Clerk of Court for the United States District Court for the District of Maryland using the CM/ECF system.

                                                          */s/ Christine M. Costantino*
                                                          Christine M. Costantino

318028518v.3